# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TODD (HYUNG-RAE) TARSELLI, | ) | |
| | ) | Civil Action No. 10 - 1266 |
| Plaintiff, | ) | |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | ECF No. 43 |
| C.O. HARKLEROAD, C.O. J.M. | ) | |
| SMITH, LIEUTENANT TANNER, | ) | |
| MAJOR WINFIELD, | ) | |
| SUPERINTENDENT FOLINO, | | |
| CHIEF GRIEVANCE OFFICER | | |
| DORINA VARNER, | | |
| Defendants. | | |

## <u>MEMORANDUM OPINION</u>

Plaintiff, Todd Tarselli, is an inmate in the custody of the Pennsylvania Department of Corrections currently incarcerated at the State Correctional Institution at Greene ("SCI-Greene") in Waynesburg, Pennsylvania. Plaintiff initiated this action on September 24, 2010, by filing a Complaint against the following Defendants: Corrections Officer Harkleroad, Corrections Officer J.M. Smith, Lieutenant Tanner, Major Winfield, Superintendent Folino, and Chief Grievance Officer Dorina Varner. His Complaint asserts liability pursuant to 42 U.S.C. § 1983, alleging violations of due process and his rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment in connection with the confiscation of art supplies and related items from his cell on January 25, 2010, and the revocation of his art permit.[1]

---

[1] Also in his Complaint, Plaintiff set forth certain state law claims; however, he voluntarily dismissed those claims in his Reply to Defendants' Answer (ECF No. 22 at 15).

Defendants filed an Answer to Plaintiff's Complaint on December 9, 2010 (ECF No. 20), and following discovery, filed a Motion for Summary Judgment on July 1, 2011 (ECF No. 43). In support of their motion, Defendants attached four exhibits containing over one-hundred twenty pages of documents relating to Plaintiff's claims. (ECF No. 46.) Defendants also filed a Brief in Support of Summary Judgment (ECF No. 44) and a Concise Statement of Material Facts (ECF No. 45). In response, Plaintiff filed a Brief in Opposition to Summary Judgment (ECF No. 55), Responsive Concise Statement of Material Facts (ECF No. 56), Statement of Undisputed Material Facts (ECF No. 57), Statement of Genuine Issues of Material Fact (ECF No. 58) and over eighty pages of exhibits (ECF No. 59). Defendants filed a Reply to Plaintiff's Brief in Opposition to Summary Judgment (ECF No. 64), and Responses to Plaintiff's Statement of Undisputed Material Facts (ECF No. 66) and Statement of Genuine Issues of Material Facts (ECF No. 67).

## A. Facts

Following an alleged escape attempt at SCI-Rockview, Plaintiff was transferred to the Restricted Housing Unit ("RHU") and placed on the Restricted Release List ("RRL") at SCI-Greene in December 1997. (ECF No. 45 at 1; No. 46-1 at 1-9; No. 56 at 16.) Plaintiff remained in the RHU until July 1999, at which point he was released to general population. (ECF No. 45 at 1; No. 46-1 at 2; No. 56 at 16.) Following an incident in April 2001, in which Plaintiff was allegedly observed whispering with other inmates under suspicious circumstances, Plaintiff's cell was searched and a large piece of black velour, a razor blade and extra pillow cases and towels were found. (ECF No. 45 at 2; No. 46-1 at 2-3; No. 49-1 at 2.) Plaintiff claimed that the black velour was given to him by a staff member in the art department, but security determined that there was enough material to make a rope or dark clothing that could be used in an escape. (ECF

No. 45 at 2; No. 46-1 at 3; No. 56 at 16.)  As a result, Plaintiff was issued a misconduct, found guilty and assessed 45 days of disciplinary confinement, after which he remained in the RHU on RRL status.  (ECF No. 45 at 2; No. 46-1 at 3; No. 56 at 16.)  The Program Review Committee, which included Defendant Winfield, recommended Plaintiff's release from the RRL in August 2008 subject to a detailed step-down plan involving close supervision.  (ECF No. 45 at 2; No. 46-1 at 3, 5; No. 49-1 at 3; No. 56 at 16.)  The proposed step-down plan was approved and Plaintiff was returned to general population in October 2008.  (ECF No. 45 at 2; No. 46-1 at 5, 6; No. 49-1 at 3; No. 56 at 16.)  Defendant Winfield stressed that in order to continue in general population, Plaintiff's conduct could in no way be perceived as plotting or planning an escape. (ECF No. 45 at 2; No. 49-1 at 3; No. 56 at 16.)

After returning to general population in October 2008, Plaintiff began asking about ordering art supplies and obtaining an updated art permit, as he had an art permit that had been issued in 1999.  (ECF No. 45 at 3; No. 46-2 at 3, 10-13, 18; No. 49-1 at 3; No. 56 at 17.)  The art permit at SCI-Greene permits inmates to order, and keep in their cells, potentially hundreds of art items.  (ECF No. 45 at 3; No. 46-3 at 34; No. 56 at 17.)  According to Defendant Winfield, she had reservations permitting Plaintiff to order art supplies given Plaintiff's escape history and previous incident involving the black velour.  (ECF No. 45 at 3; No. 46-2 at 15; No. 49-1 at 3-4.) She initially limited Plaintiff's purchases and advised security to watch for efforts by Plaintiff to collect too much of any one thing, but by August and September of 2009, staff began to relax some of the restrictions.  (ECF No. 45 at 3, 4; No. 46-2 at 31-33; No. 49-1 at 3-4.)

During a random cell search on January 18, 2010, Officers discovered in Plaintiff's cell two standard art boards that appeared to be loosened or torn at the edge.  (ECF No. 45 at 4; No. 46-2 at 43; No. 56 at 17.)  Upon inspection, the art boards were found to have hidden

compartments which contained pornographic magazines. (ECF No. 45 at 4; No. 46-2 at 43; No. 56 at 17.) As a result, Plaintiff was issued a misconduct report and pled guilty to charges of altering property and possessing contraband. (ECF No. 45 at 4; No. 46-2 at 43; No. 56 at 17.)

Following the January 18, 2010 incident, Defendant Winfield instructed the Security Department to conduct a thorough search of Plaintiff's cell and confiscate all art-related items as well as anything else that seemed suspicious. (ECF No. 45 at 4; No. 49-1 at 4.) Because of the altered items discovered in Plaintiff's cell on January 18, 2010, and because Plaintiff presented escape concerns and had a history of possessing art-related materials as potential implements of escape, Defendant Winfield felt that security concerns justified the removal of all art-related items. (ECF No. 45 at 4; No. 49-1 at 4.) Defendant Winfield also revoked Plaintiff's art permit and directed that he not be permitted to purchase more art supplies. (ECF No. 45 at 5; No. 46-3 at 32; No. 49-1 at 4.)

Defendants Harkleroad and Smith conducted the confiscation of all art-related items from Plaintiff's cell on January 25, 2010, per Defendant Winfield's instructions, and removed a substantial amount of material from the cell, including two large boxes and several oversized items. (ECF No. 45 at 5; No. 46-4 at 4, 5; No. 56 at 17.) This included items that were both covered and not covered by Plaintiff's art permit. (ECF No. 1 at 7.) Plaintiff asserts that, during the search, Defendant Harkleroad came across artwork that was critical of the DOC and made intimidating and racially insensitive statements toward Plaintiff. (ECF No. 1 at 8.)

After the search, Defendant Harkleroad sat with Plaintiff for several hours and inventoried all the confiscated items, listing them on seven confiscation slips. (ECF No. 45 at 5; No. 46-4 at 4; No. 56 at 17.) During the inventory process, Defendant Harkleroad separated items that were altered or not allowed and designated them to be destroyed by noting a "D" in

4

the disposition column of the confiscation slip.  (ECF No. 45 at 5; No. 46-3 at 2-8; No. 46-4 at 5; No. 56 at 17.)  However, this designation did not necessarily result in destruction and some of these items may have been returned to the boxes.  Certain items Plaintiff was not permitted to retain were destroyed per DOC policy after the inventory.  (ECF No. 45 at 5, 6; No. 46-4 at 5.) With respect to the remaining items confiscated, Plaintiff was given the option of shipping them home- which he chose not to do- or having them destroyed.  (ECF No. 45 at 7; No. 46-3 at 21.) The items were not destroyed, but instead remained in the security office.  (ECF No. 45 at 7; No. 46-4 at 11.)

On February 6, 2010, Plaintiff filed a grievance wherein he complained of the comments made to him by Defendant Harkleroad during the search of his cell on January 25, 2010.  (ECF No. 1-5 at 2-3.)  He also argued that the DOC could not confiscate his property without due process and require him to ship the items or they would be destroyed; that the revocation of his art permit was an unreasonable over-reaction to security concerns; that confiscation of art-related items not covered by the art permit such as personal sketches, art books, and art magazines, violated the First Amendment; and that one of the books seized was a used book and not "property of another" as described by Defendant Harkleroad.  (ECF No. 1-5 at 2-3.)  Defendant Tanner responded by denying Plaintiff's grievance on February 16, 2010, noting that Defendant Harkleroad had denied making the alleged statements and their concern was that Plaintiff was "once again testing the parameters of involving [himself] in another escape attempt."  (ECF No. 1-6 at 2.)  Plaintiff appealed on February 28, 2010, arguing that the incident involving the art boards used to conceal pornographic magazines was in no way related to "plotting or planning an escape."  (ECF No. 1-7 at 2.)  Instead he was simply trying to hide the magazines so he could keep them.  (ECF No. 1-7 at 2.)  Defendant Folino denied Plaintiff's appeal on March 2, 2010,

(ECF No. 1-8 at 2), and Plaintiff filed his last appeal on March 12, 2010, (ECF No. 1-9 at 2-3), which was denied by Defendant Varner on March 31, 2010 (ECF No. 1-10 at 2).

Plaintiff served 90 days in disciplinary custody for the January 18, 2010, misconduct involving the altered art boards and pornographic magazines, and he remained in the RHU on AC status until early 2011, when he was once again released back into general population. (ECF No. 45 at 8; No. 49-1 at 5; No. 56 at 18.)

After Plaintiff filed this lawsuit and a motion to preserve his property, a second inventory of his property was performed on October 26, 2010, by Officer Tait. (ECF No. 45 at 7; No. 46-3 at 10-19; No. 46-4 at 11.) Officer Tait's inventory matched Defendant Harkleroad's inventory from January 25, 2010, except with respect to a few items. She found several things that were not destroyed although originally designated for destruction, and a few items not accounted for on the confiscation slips. (ECF No. 45 at 7; No. 46-3 at 10-19; No. 46-4 at 12.) Officer Tait also could not locate a pencil sharpener and a large roll of craft paper that were listed on the confiscation slips. (ECF No. 45 at 7-8; No. 46-3 at 10-19; No. 46-4 at 12.)

Plaintiff was permitted to inspect his confiscated property on June 8, 2011, at which point he looked at a large priority envelope containing several inches of papers and drawings and said that things were missing, namely drawings critical of the DOC. (ECF No. 45 at 10; No. 46-4 at 13; No. 56 at 19.) Additionally, several larger items that had been identified on the original confiscation slips from January 25, 2010, could not be located. (ECF No. 39 at 1.) After several attempts to locate the items were unsuccessful, Plaintiff was reimbursed for the cost of the items. (ECF No. 39 at 3.)

After consultation with the Office of Attorney General, SCI-Green's Security Captain, Craig Haywood, was willing to consider returning some of Plaintiff's confiscated property,

particularly his books and the large priority envelope containing several inches of papers and personal drawings, as those items did not appear to raise the same security concerns or risks associated with the art-related items and supplies. (ECF No. 45 at 10; No. 46-4 at 13; No. 49-1 at 11-12.) However, after Plaintiff inspected the property on June 8, 2011, and suggested that drawings had been removed from the priority envelope, counsel for Defendants advised Captain Haywood and Plaintiff that the envelope and its contents should be retained as potential evidence, and not returned. (ECF No. 45 at 10-11; No. 46-4 at 13; No. 56 at 19.)

On June 21, 2011, while the superintendent's assistant was making copies of the drawings contained in the priority envelope for defense counsel and Plaintiff, she discovered a drawing that contained pieces of broken staple taped carefully onto a sketch of a ram's head. (ECF No. 45 at 11; No. 49-1 at 12, 14; No. 46-4 at 13.) Defendants contend that the staple pieces were not easy to see and had not been discovered in the prior inventories by Defendant Harkleroad and Officer Tait, but the staples were clearly contraband and/or altered property in violation of DOC policy. (ECF No. 45 at 11; No. 49-1 at 12; No. 46-4 at 13.) With this discovery, Captain Haywood states that he has serious safety and security concerns with allowing Plaintiff access to personal drawings and books that were removed from his cell on January 25, 2010. (ECF No. 45 at 11; No. 49-1 at 12.) However, Plaintiff denies he ever had any staples hidden in his artwork or anywhere in his property. (ECF No. 56 at 19.)

### B. Summary Judgment Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of

any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

### C. Personal Involvement

To establish individual liability under section 1983, "[a] defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also* Rizzo

v. Goode, 423 U.S. 362 (1976). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207-08. Thus, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Id.

Defendants assert that there is no evidence that Defendants Tanner, Folino, or Varner had any involvement in the search and confiscation of Plaintiff's property or in the revocation of Plaintiff's art permit and their "involvement" was limited to the roles each played in responding to Plaintiff's grievance and appeals, which is insufficient to establish personal involvement under section 1983. Plaintiff, however, asserts that Defendants misconstrue his claims against these three Defendants alleging that Defendants Tanner, Folino, and Varner were aware of the alleged constitutional violations and "failed to remedy a wrong when they [had] an obligation to do so." (ECF No. 55 at 35.) In support, Plaintiff cites to Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986), wherein the Second Circuit stated that a plaintiff may demonstrate personal involvement by a **supervisory official** if "after learning of the violation through a report or appeal, may have failed to remedy the wrong." However, it is clear Plaintiff does not seek to hold these three Defendants liable based on a supervisory capacity as no allegation in his Complaint supports such a conclusion. On the contrary, it is clear that liability is sought against Defendants Tanner, Folino, and Varner based solely on their role in the grievance procedure.

As Defendants correctly note, participation in the after-the-fact review of a grievance or appeal is not enough to establish personal involvement. See Rode, 845 F.2d at 1208 (finding the filing of a grievance is not enough to show the actual knowledge necessary for personal involvement); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed

to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying alleged unconstitutional conduct); <u>Croom v. Wagner</u>, No. 06-1431, 2006 U.S. Dist. LEXIS 64915, at *13 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); <u>Ramos v. Pennsylvania Dept. of Corr.</u>, 2006 U.S. Dist. LEXIS 51582, at *6-7 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement); <u>Pressley v. Blaine</u>, No. 01-2468, 2006 U.S. Dist. LEXIS 30151, at *17 (W.D. Pa. May 17, 2006) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern.") (citing <u>Garfield v. Davis</u>, 566 F. Supp. 1069, 1074 (E.D. Pa. 1983)).  A review of the Complaint reveals no facts alleging personal involvement on the part of Defendants Tanner, Folino, and Varner except for their participation in the disposition of Plaintiff's grievance.  Because this is insufficient to establish personal involvement, Plaintiff's claims against these Defendants must be dismissed.[2]

### D.  Due Process

Plaintiff claims that the confiscation of his personal property[3] without a post-deprivation hearing violated his Fourteenth Amendment right to procedural due process.

The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST.

---

[2]     To the extend Defendants contend that Plaintiff fails to establish personal involvement on the part of Defendants Harkleroad and Smith, the Court disagrees.

[3]     An inventory of the art supplies and art-related items that were removed from Plaintiff's cell was performed on January 25, 2010, and while certain items that were altered or apparent contraband were identified for destruction, Plaintiff was given the opportunity to ship his remaining property home.  In fact, courts have held that as long as the inmate is given an opportunity to say where the property should go, procedural due process is satisfied.  <i>See</i> <u>Guiden v. Werholtz</u>, No. 11-3031-SAC, 2011 U.S. Dist. LEXIS 50890, at *33 (D. Kan. May 11, 2011); <i>see also</i> <u>Scott v. Case Manager Owens</u> (SCF), 80 F. App'x 640, 643 n.2 (10th Cir. 2003) (citing <u>Searcy v. Simmons</u>, 299 F.3d 1220, 1229 (10th Cir. 2002) (Due process is satisfied when a prison disposes of an inmate's property after providing a meaningful opportunity for the inmate to send it to someone outside the prison.))

amend. XIV. The procedural aspect of the Due Process Clause guarantees the availability of certain procedural mechanisms, typically the right to notice and a hearing, before the government can deprive an individual of a liberty or property interest. In the context of confiscating an inmate's property, however, the Supreme Court has held that meaningful post-deprivation remedies for the loss provide sufficient due process for negligent deprivations of property, Parratt v. Taylor, 451 U.S. 527, 530 (1981), and intentional deprivations of property, Hudson v. Palmer, 468 U.S. 517, 533 (1984); *see also* Barr v. Knauer, 321 F. App'x 101, 103 (3d Cir. 2009); Doe v. Delie, 257 F.3d 309, 316 (3d Cir. 2001).

The threshold question in assessing Plaintiff's procedural due process claim is whether he was deprived of a protected property interest. A property interest may arise from "existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Although Plaintiff concedes that he has no protected property interest in his art supplies because it was classified as contraband once the DOC revoked his art permit,[4] he asserts that he has a protected property interest in the confiscated art-related items that were not covered by his art permit, namely his personal sketches, artwork, art books and art magazines. (ECF No. 55 at 20.) Assuming Plaintiff had a protected property interest in these items, the Third Circuit Court of Appeals has held that the Pennsylvania DOC's grievance procedure pursuant to DC-ADM 804 provides an adequate post-deprivation remedy, and that the existence of this post-deprivation remedy forecloses any due process claim. *See* McEachin v. Beard, 319 F. Supp. 2d 510, 514-15 (E.D. Pa. 2004) (citing Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 422 (3d Cir. 2000)) Thus, to the extent Plaintiff's claim rests on the

---

[4]     Inmates do not have a property interest in items that are considered contraband. *See* Dantzler v. Beard, No. 09-275, 2010 U.S. Dist. LEXIS 107656, at *36 (W.D. Pa. March 15, 2010).

contention that Defendants confiscated his property without due process, the Court finds that, absent any evidence to the contrary, adequate and meaningful post-deprivation processes were available to Plaintiff through the prison grievance procedure, which he, in fact, utilized.

Plaintiff claims that he was denied a "meaningful" post-deprivation remedy because the grievance system did not afford for the return of his non-contraband property. However, the failure of a prison official to provide a favorable response to an inmate grievance does not demonstrate that the process was inadequate, meaningless, or otherwise constitutionally infirm. *See* Morales v. Beard, No. 09-162, 2009 U.S. Dist. LEXIS 66272, at *4 (W.D. Pa. July 31, 2009); McEachin, 319 F. Supp. at 515; Austin v. Lehman, 893 F. Supp. 448, 454 n.4 (E.D. Pa. 1995) ("Of course, that Plaintiff did not prevail in this procedure in no way affects the procedure's adequacy as a post-deprivation remedy.").

To the extent Plaintiff claims that the grievance system did not provide for a "meaningful" post-deprivation remedy due to Defendant Tanner's involvement as a grievance officer, his claim is also without merit. DC-ADM 804[5] prohibits staff who are involved in the underlying grieved issue from serving as grievance review officers. Plaintiff states that Defendant Tanner, who responded to his grievance at the first level review, was "involved" in violation of DC-ADM 804. Specifically, Plaintiff states that he was one of Defendant Tanner's "security cases" when released from the RRL to general population in October 2008, and Defendant Tanner was in charge of "high intensive oversight" of Plaintiff by virtue of his position as Security Lieutenant. (ECF No. 1 at 11.) He contends that Defendant Winfield's order to confiscate his property "would have been delegated" to Defendant Tanner who would

---

[5] Per DC-ADM 804, § 1.B.5, "The staff member who serves as the Grievance Officer may not be directly involved as the subject of the grievance."

have then delegated the task to Defendants Harkleroad and Smith. (ECF No. 1 at 11.) Thus, he argues that Defendant Tanner was "personally involved" in the actions leading to his grievance and served as the grievance officer contrary to DOC policy. (ECF No. 1 at 11.)

Defendant Tanner was not named or accused of any wrongdoing in Plaintiff's grievance, and while Defendant Tanner cannot recall whether Defendant Winfield's order to confiscate art-related items from Plaintiff's cell passed through him as one of the Security Lieutenants, he states that he was not present for, or involved in, the January 25, 2010 search and confiscation of Plaintiff's property. (ECF No. 46-4 at 9.) According to Defendant Tanner, his knowledge and understanding of the search and confiscation issues that day came from his investigation of Plaintiff's grievance. (ECF No. 46-4 at 9.) Nevertheless, prison regulations do not, in themselves, confer a liberty interest protected by due process, and the failure of prison officials to follow DOC policy does not, in and of itself, result in a violation of due process. *See* O'Connell v. Sobina, No. 06-238E, 2007 U.S. Dist. LEXIS 98780, at *45-46 (W.D. Pa. Dec. 3, 2007).

In the instant case, the Court concludes that Plaintiff had an adequate post-deprivation remedy that was available to him through the prison grievance system and he has not shown that this remedy was not meaningful. As such, the Court finds that Defendants are entitled to summary judgment as to this claim.[6]

---

[6] The Court expresses no opinion as to Plaintiff's ability to pursue an action for damages in state court for the alleged deprivation of his property. Moreover, to the extent Plaintiff seeks to assert a new due process claim via his summary judgment response, focused on alleged "missing" or destroyed drawings which he claims to have discovered during the June 8, 2011, inspection of his confiscated property, the Court declines to consider such claim as it was not properly presented in Plaintiff's Complaint and was raised for the first time in his response to Defendants' motion for summary judgment. Nevertheless, Plaintiff was afforded an adequate post-deprivation remedy through the prison grievance system, which he apparently utilized by filing a grievance on June 28, 2011, raising the issue of various items of alleged missing property. Plaintiff's grievance was investigated and he was, in fact, reimbursed for items of property that were found to be missing. (ECF No. 65-1 at 3-4.) To the extent Plaintiff is unsatisfied with the grievance result because he was not reimbursed for items which he contends were missing –

13

## E.  First Amendment – Freedom of Speech and Expression

Plaintiff asserts that the confiscation of art-related items not governed by the art permit – his personal sketches, artwork, art books and art magazines – violated his First Amendment right to freedom of speech and expression.  The Court notes that it could find no authority to support Plaintiff's claim that he has a protectable First Amendment interest in the right to possess artwork, drawings and publications, and while the Court does not hold that Plaintiff has such a protectable interest, it will assume, for purposes of this analysis, that such an interest exist.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST. amend. I.  The First Amendment is applicable to the states via the Fourteenth Amendment.  DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000).  The Supreme Court has held that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  However an inmate retains only those "First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822 (1974).

In Turner v. Safley, 482 U.S. 78 (1987), the United States Supreme Court identified four factors to be considered in evaluating the constitutionality of a prison regulation, policy or action.  A prison regulation, policy, or action that impinges on an inmate's constitutional rights is nonetheless valid if it is "reasonably related to legitimate penological interests."  Id. at 89.  In determining whether a restriction is reasonably related to legitimate penological interests, a court must weigh: (1) whether there is a "valid, rational connection between the prison regulation and

---

namely sketches or drawings that were political in nature and/or critical to the DOC – Plaintiff has not demonstrated that the prison grievance system was inadequate or not meaningful for this reason.

the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives." <u>Turner</u>, 482 U.S. at 89-90. The ultimate burden is on the plaintiff to disprove the validity of the regulation or decision. <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003). However, defendants must put forward the legitimate governmental interest alleged to justify the regulation or decision. <u>Turner</u>, 482 U.S. at 89. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. <u>Beard</u>, 548 U.S. at 530.

With respect to the first <u>Turner</u> factor, Defendants assert that Defendant Winfield's decision to order the confiscation of Plaintiff's art-related materials from his cell on January 25, 2010, was rationally related to legitimate security interests at SCI-Greene. While Plaintiff concedes that prison security is a legitimate penological interest and that Defendants may have been justified in confiscating his art supplies following the revocation of his art permit, he asserts that the "total and complete confiscation of everything art related" was an unreasonable, exaggerated response to security concerns that does not justify an infringement on his First Amendment rights. (ECF No. 55 at 12-13.) Specifically, Plaintiff argues that Defendants fail to explain how art related items such as his personal sketches, artwork, art books and art magazines present a security risk or how the confiscation of such items serves a legitimate governmental interest. Defendants respond that the confiscation of everything art-related from Plaintiff's cell was not an exaggerated response as Plaintiff suggests but instead a justifiable response to

legitimate security concerns given the recent discovery of altered art items, Plaintiff's escape history, and his "skill at deception through misuse of art materials." (ECF No. 44 at 16.)

It is well established that safety and internal security are legitimate goals for prison administrators. Overton, 539 U.S. at 133; Hewitt v. Helms, 459 U.S. 460, 473 (1983); Turner, 482 U.S. at 78, 86, 87, 92. Defendants also advocate that prison officials have the right and the responsibility to anticipate security problems and take appropriate action to prevent future criminal behavior. Indeed, the Supreme Court has stated that prevention of future criminal behavior is a legitimate government interest and prison administrators are entitled to rely on predictions of future behavior in formulating policy. Hewitt, 459 U.S. at 474; *see also* North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132-33 (1977) (finding that inmates' First Amendment free association rights can be limited when prison officials conclude, in their discretion, that certain activities "possess the likelihood of disruption to prison order or stability."). Additionally, "to show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." Mauro v. Arpaio, 188 F.3d 1054, 1060 (9th Cir. 1999) (citing Thornburgh v. Abbott, 490 U.S. 401, 417 (1989)); *see also* Espinoza v. Wilson, 814 F.2d 1093, 1098 (6th Cir. 1987) (noting that prison officials need not show an actual danger exists to support the reasonableness of a prison regulation, but rather only need to show a potential danger exists without the challenged regulation) (citations omitted).

Defendants have demonstrated that a potential for danger existed had Plaintiff been permitted to retain access of his art-related items, even those items not governed by the art permit. Given Plaintiff's prior history involving escape and the discovery that Plaintiff had

altered art boards to fashion hidden compartments, the concern held by Defendant Winfield and security was that Plaintiff was testing the waters of his new relaxed restrictions in general population by engaging in conduct through his art-related items that could potentially implicate serious security matters. While Plaintiff was only concealing pornography in the hidden compartments in his art boards, it is not unreasonable to think that, given Plaintiff's track record, he could have used the compartments to hide instruments of escape. Given the deference owed to prison officials, and for the reasons stated above, the Court finds that Defendants have established that the confiscation of Plaintiff's art-related items, including those items not governed by the art permit, was rationally related to legitimate penological interests concerning institutional security.

Under the second <u>Turner</u> factor, the Court must determine whether alternative means exist for Plaintiff to express the asserted right. The Supreme Court has instructed that "'the right' in question must be viewed sensibly and expansively." <u>Thornburgh</u>, 490 U.S. at 418. The focus is whether there are alternative means of expression. In addition to broadly construing the right at issue, the Court has also dictated that "[a]lternatives . . . need not be ideal; however, they need only be available." <u>Overton</u>, 539 U.S. at 135.

Plaintiff asserts that he has no alternative ways to express himself artistically because Defendants confiscated everything art-related, including art related literature books on loan from the prison library. He states that the intent of the Defendants "was a total and complete suffocation of any artistic expression." (ECF No. 55 at 14.) Defendants, however, suggest that Plaintiff is still able to express himself artistically by drawing on standard paper and he is also able to possess a wide variety of material of a political, economic, and legal nature. With respect to the library books that were part of the confiscation on January 25, 2010, Defendants assert that

the books were returned to the library and no one is preventing Plaintiff from re-obtaining those books or other art publications either via the library or outside purchase. (ECF No. 64 at 5; No. 65-1 at 2.) While in general population, Plaintiff is permitted to have three library books per week and may purchase outside publications in accordance with prison policy, but Plaintiff has not submitted any purchase requests. (ECF No. 64 at 5; No. 65-1 at 2.) Clearly, there are alternative means of artistic expression open to Plaintiff and these must be taken into account in determining the overall reasonableness of Defendants' decision to confiscate the art-related items from Plaintiff's cell on January 25, 2010. Therefore, the Court finds that the second <u>Turner</u> factor weighs in favor of Defendants.

The third <u>Turner</u> factor requires consideration of "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." <u>Turner</u>, 482 U.S. at 90. Here, Defendants contend that accommodating Plaintiff's asserted right would pose serious security and safety concerns for guards and inmates. Plaintiff suggests that these "security concerns" only recently arose with the discovery of the alleged staple found in one of Plaintiff's sketches on June 21, 2011, and therefore, cannot support a justification for the original confiscation of the art-related items on January 25, 2010. Plaintiff, however, is mistaken. Without regard to the alleged staple, Defendants argue that Plaintiff's art-related items were confiscated due to the concern with his past escape attempt, his misuse of art material in a "suspicious" context, and the discovery that he was altering art materials to hide contraband. While the discovery was not necessarily evidence of impending escape, Defendants suggest that Plaintiff was testing his new limits in general population and engaging in conduct via his artwork that could, if not checked, be used in a much more serious manner. Defendants maintain, and the Court agrees, that had the situation

not been corrected by confiscating the art-related items, including items not governed by the art permit, the safety of guards and inmates could have been significantly compromised. Consideration of these security concerns pushes this third <u>Turner</u> factor in favor of Defendants.

Under the fourth <u>Turner</u> factor, courts are to look at the presence or absence of ready alternatives that would fully accommodate the plaintiff's rights at *de minimis* costs to valid penological interests. <u>Turner</u>, 482 U.S. at 90-91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." <u>Id</u>. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Id</u>. As possible alternatives to confiscating Plaintiff's art-related items not covered by the art permit, Plaintiff suggests that the prison could have used their "security apparatus," including metal detectors, x-rays, and search teams to conduct a thorough, page-by-page search of Plaintiff's personal sketches, artwork, art books and art magazines to ensure they were free of contraband. Plaintiff also suggests that he could have replaced all his art books and magazines with publications purchased directly from the vendor to alleviate any security concerns as to whether his literature contained contraband. However, as Defendants point out, a detailed page-by-page review and inspection of Plaintiff's papers and books would take a significant amount of time. Moreover, once SCI-Green's Security Captain, Craig Haywood, was prepared to return the personal drawings and artwork, Plaintiff inspected the items and claimed that some of his drawings were missing. The items were therefore not returned given the potential evidentiary dispute. Additionally, the discovery of the alleged staple or broken staple pieces disguised in Plaintiff's personal artwork by the superintendent's assistant on June 21, 2011, raised even more safety and security concerns with allowing Plaintiff access to his

personal drawings and books as the staple pieces were not easy to see and could be used to injure staff or other inmates, or as an implement of escape. Therefore, given the potential for contraband even in Plaintiff's personal sketches and artwork, the difficulties in locating it and the man hours required for a page-by-page inspection of Plaintiff's property, there was no reasonable alternative that would fully accommodate Plaintiff's rights.

In sum, the balancing test required under <u>Turner</u> clearly supports a finding that the confiscation of Plaintiff's art-related items, both governed and not governed by the art permit, did not violate Plaintiff's First Amendment rights. Thus, Defendants are entitled to summary judgment as to this claim.

### F. Equal Protection

Plaintiff contends that Defendants violated his right to equal protection because he was denied his right to freedom of speech/expression and due process. Specifically, he asserts that all Pennsylvania DOC inmates are similarly situated in that they are afforded freedom of speech and due process protections not inconsistent with their status as prisoners but he was denied these protections as a result of intentional or purposeful discrimination due to his status as an artist. (ECF No. 55 at 33.) He asserts that Defendants' intentional or purposeful discrimination is evidenced by the fact that they confiscated "everything art-related," as opposed to only those art supplies covered by the art permit. (ECF No. 55 at 34.) Plaintiff also appears to assert that he was treated differently from other inmates who have abused a privilege in that he was sanctioned to an indefinite loss of his privilege for a first offense when other inmates are subjected to a loss of privilege for a prescribed period of time. (ECF No. 55 at 34-35.)

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST.

amend. XIV. This is not a command that all persons be treated alike, but, rather, a direction that all persons similarly-situated be treated alike. *See* <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985). The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race, religion, gender or other impermissible classifications. If the action does not involve a suspect classification, the plaintiff may establish an equal protection claim under a "class of one" theory by showing that he or she was intentionally treated differently from other similarly situated individuals without a rational basis for the difference in treatment. <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000). Accordingly, to state a claim under this theory, the plaintiff must allege that (1) he or she was treated differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment. <u>Id</u>.

First, Plaintiff asserts that he was discriminated against in comparison to other inmates, but he does not claim discrimination based on membership in a protected class.[7] Therefore, in order to state an equal protection claim, he must allege intentional discrimination as a "class of one" and that his treatment was not rationally related to any penological interests.

Here, Plaintiff alleges that he was treated differently from other inmates in general because he was not afforded First Amendment and due process protections. However, Plaintiff fails to demonstrate that he was in fact treated differently because, as discussed *supra*, he was not denied these rights. Next, to the extent Plaintiff alleges that he was treated differently from other

---

[7]      Prisoners are not a suspect class for the purposes of Equal Protection. *See*, *e.g.*, <u>Abdul-Akbar v. McKelvie</u>, 239 F.3d 307, 317 (3d Cir. 2001). Thus, the government may treat incarcerated individuals differently as long as its decisions are "rationally related to a legitimate . . . [government] interest." <u>United States v. King</u>, 62 F.3d 891, 895 (7th Cir. 1995) (quoting <u>City of Cleburne</u>, 473 U.S. at 440).

inmates who have abused a privilege in that he should have been sanctioned to a loss of his art privilege for a prescribed period of time under DC-ADM 801 disciplinary policy,[8] he fares no better. Plaintiff contends that inmates who are caught abusing a privilege are subjected to a loss of that privilege and all related items for a prescribed period of time but never for an indefinite loss of that privilege for a first offense. However, Plaintiff has failed to show that he is similarly situated to inmates who are sanctioned for misconduct and subjected to a loss of privileges under DC-ADM 801. In connection with disciplinary proceedings, DC-ADM 801 suggest certain Class 1 misconduct sanctions that a hearing examiner may impose, including loss of TV, radio, telephone and commissary privileges. However, unlike these privileges available to all inmates, an art permit is a unique privilege granted only to certain inmates, and Plaintiff has neither identified anyone who was similarly situated with an art permit nor alleged that he was punished differently for the same behavior than other inmates with art permits. Moreover, Plaintiff has not demonstrated the existence of intentional or purposeful discrimination necessary to prove an equal protection violation or that there was no rational basis to any legitimate penological interest for the revocation of his art permit and seizure of all art-related items from his cell. Instead, it is clear that Defendants' actions were based on legitimate security concerns and concern for the safety of staff and other inmates.

Because Plaintiff has failed to present facts demonstrating that he was treated differently than similarly situated inmates as a result of intentional or purposeful discrimination, summary judgment will be entered in favor of Defendants with regard to Plaintiff's equal protection claims.

---

[8]        DC-ADM 801, § 4.B.4.c provides that, ". . . one or more of the following sanctions may also be imposed for a Class I misconduct – loss of privileges for a prescribed period. Privileges lost shall be specifically identified and shall, where possible, be related to the misconduct violation. Privileges include television, radio, telephone, and commissary for up to 180 days, visiting suspension or restriction for up to 60 days, yard and blockout."

## G.  Conclusion

For the reasons set forth above, Defendants are entitled to summary judgment with respect to Plaintiff's claims.  An appropriate order will be entered.

Dated: February 23, 2012

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Todd (Hyung-Rae) Tarselli
    BY-8025
    175 Progress Drive
    Waynesburg, PA  15370

    Counsel of Record